**KUTAK ROCK LLP**
Loc Pfeiffer  (VSB No. 39632)
Kimberly A. Pierro (VSB No. 71362)
1111 East Main Street, Suite 800
Richmond, Virginia  23219-3500
Telephone:  (804) 644-1700
  *Counsel for Edward F. Whelan, III*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN RE:<br>BANKS AUTO PARTS, INC., | Case No. 07-32884-KRH<br>Chapter 11 |
| Debtors. | |
| EDWARD F. WHELAN, III, | |
| Plaintiff, | |
| v. | Adv. Pro. No. _____ |
| BANKS INVESTMENTS, I, LC,<br>OLANDER BANKS,<br>GREGORY BANKS,<br>RONALD BANKS, | |
| Defendants. | |

**COMPLAINT**

Edward F. Whelan, III ("Whelan"), by counsel, states the following in support of this Joinder of Additional Claims against Defendants:

**PARTIES**

1. Plaintiff Whelan is a resident of Fredericksburg, Virginia with an address at 1707 Princess Anne Street, Fredericksburg, Virginia 22401.

2. Defendant Banks Investments I, LC is a Virginia entity that owns certain real property located in the Commonwealth of Virginia.

3. Defendant Olander Banks is a Virginia resident with an address of 7400 Old Telegraph Road, Alexandria, Virginia, 22315.

4. Defendant Gregory Banks is a Virginia resident with an address of 6400 Old Telegraph Road, Alexandria, Virginia, 22315.

5. Defendant Ronald Banks is a Virginia resident with an address of 6400 Old Telegraph Road, Alexandria, Virginia, 22315.

6. All references to the "Banks" shall mean Banks Investments I, LC, Olander Banks, Gregory Banks, and/or Ronald Banks.

**FACTS**

7. In late 2001 or early 2002, Jose Torrico ("Torrico") agreed with Olander Banks to purchase the auto salvage and parts business known as "Banks Auto Parts, Inc.," ("Banks Auto Parts") and the underlying real estate upon which the business operated, consisting of two parcels of land in Spotsylvania County, Virginia, containing approximately 30 acres.

8. As a condition to the purchase, Olander Banks insisted that the transaction be structured with him and his related entity such that the purchase of the operating business of Banks Auto Parts would be separate from the purchase of the real estate, although Torrico's obligation would be "cross-collateralized" and that Torrico would form two separate entities to act as principals in the transactions.

9. Accordingly, Mr. Torrico caused to be created (a) Fanapa, LLC, ("Fanapa LLC") - the entity which leased (and held the option to purchase) the real estate from its purported

2

owner, Banks Investments and (b) Fanapa USA, Inc., ("Fanapa USA") - the entity that acquired the stock of Banks Auto Parts - the owner and operator of the auto salvage and parts business.

10. Initially, the transaction was to be structured in the form of a sale of both the business and the land upon which the business operated. In the interim period from about February 2002 through June 2002 (while the parties negotiated the specific terms and drafted the requisite documents), Torrico received possession of such premises and operated Banks Auto Parts.

11. On June 11, 2002, Olander Banks caused Banks Investments to enter into a six-year lease with Fanapa LLC for what was supposed to be the underlying real estate upon which Banks Auto Parts operated based upon representations made by Olander Banks and Banks Investments. That lease, dated February 20, 2002, (the "2002 Lease") contained an option to purchase the underlying realty under certain terms and conditions (the "Land Purchase Option"). A copy of the 2002 Lease is attached as <u>Exhibit 1</u>.

12. The 2002 Lease describes two parcels of land that were to be leased: (1) Parcel #1, a 24 acre lot set back from Jefferson Davis Highway, Route 1, in Spotsylvania County ("Parcel #1"), and (2) Parcel #2, a smaller, approximately 1 acre lot along Jefferson Davis Highway ("Parcel #2") (collectively the "Land"). Parcel #1 is not contiguous to Parcel #2. The description of Parcel #2 in the 2002 Lease was erroneous, in that the parties always intended to lease the real property from which Banks Auto Parts was operated. Based upon that understanding, the second parcel described in the 2002 Lease should have been an approximately 6 acre piece of land along Jefferson Davis Highway (the "6 Acre Lot") that was touching upon Parcel #1. The 6 Acre Lot was (and may still be) owned personally by Olander Banks.

13. On June 11, 2002, Fanapa USA entered into a Stock Purchase Agreement with

3

Olander Banks for the purchase of all of the stock of Banks Auto Parts. This Stock Purchase Agreement dated February 20, 2002 (the "Stock Purchase Agreement") was guaranteed by Fanapa LLC, Torrico and his wife, Rosemary Torrico. A copy of the Stock Purchase Agreement is attached hereto as Exhibit 2.

14. Also on June 11, 2002, Fanapa USA executed a Promissory Note dated February 20, 2002 (the "Promissory Note") payable to Olander Banks in the sum of $1,221,500 as part of the deferred purchase price pursuant to the Stock Purchase Agreement. A copy of the Promissory Note is attached hereto as Exhibit 3.

15. Thereafter, Banks Investments and Olander Banks put Fanapa LLC and Banks Auto Parts in possession of a leasehold consisting of Parcel #1 and the 6 Acre Parcel. Neither Fanapa LLC, Banks Auto Parts, nor Torrico ever took possession of Parcel #2 described in the 2002 Lease.

16. Fanapa LLC leased the premises and made rent payments to Banks Investments, and Fanapa USA made a $75,000 cash "down payment", and monthly note payments on the Promissory Note to Olander Banks. The rent and note payments commenced in June 2002. In addition, Fanapa LLC, Banks Auto Parts and/or Fanapa USA was supposed to make another $75,000.00 payment but was unable because they were not able to obtain certain anticipated financing. The parties agreed that the $75,000.00 obligation would be satisfied by reducing the acquired land by 1 acre.

17. Whelan has known the Banks since 2004. Whelan owns the property adjacent to the Land. As part of Whelan's acquisition of the adjacent property, Whelan obtained a sewer easement that ran through the Land. Whelan spoke to the Banks concerning the need for the sewer easement. The Banks agreed to provide the sewer easement. After acquiring the adjacent

4

property to the Land in August 2004, Whelan approached the Banks to discuss the purchase of the Land. The Banks advised Whelan that the property was "tied up." The Banks further advised Whelan about the 2002 Lease and the Land Purchase Option. Finally, the Banks instructed Whelan to direct his efforts to purchase the Land to Torrico and Fanapa LLC.

18. At the end of 2004 and pursuant to the Banks' instructions, Whelan met and became acquainted with Torrico thereafter. Subsequently, Whelan discussed extensively with the Debtors[1] about getting involved with the auto salvage business and acquiring the Land from the Banks. The plan was for Whelan to provide management services for the business. Whelan would handle the day-to-day office duties such as administrative functions, handle the finances including billing, collecting and obtaining credit, marketing, etc.; Torrico would focus on running the heavy machinery, locate new inventory, buy and sell salvaged auto parts, etc. In other words, Whelan handled the business affairs so that Torrico could do what he did best – run the salvage yard itself.

19. The second half of the plan was to acquire the Land from the Banks. The Land was obviously necessary to run the auto salvage business. The Debtors always intended to purchase the Land – that is why the Land Purchase Option existed. Torrico would benefit because the sale proceeds would be used to pay the Promissory Note in full – Torrico would own the salvage business free and clear of all liens. As to Whelan, Whelan had a strong vested interest in the Land and in the business. Whelan owned the property next door and was investing significant sums of money and resources. Whelan did not merely want the Land – Whelan wanted to develop the area into a prosperous business corridor. By entering into a joint venture with the Debtors, Whelan would be able to achieve his goal and the entire corridor would significantly benefit from Whelan's efforts. As of the petition date, Whelan (individually and

---

[1] The term "Debtors" shall mean Torrico, Fanapa LLC, Fanapa USA and/or Banks Auto Parts.

4824-0467-2514.4

through his company Cleremont Office, LLC) have put at least $500,000 into the Debtors' business. Thus, Whelan is committed to the joint venture and to making the corridor better.

20. In August of 2005, Whelan and the Debtors reached several agreements to carry out their venture. On August 13, 2005, Torrico and Fanapa LLC entered into a Real Estate Purchase Contract. This Real Estate Purchase Contract was not drafted by an attorney and was put together by the parties themselves. The parties agreed to terminate the Real Estate Purchase Contract after it was reviewed by counsel. On August 19, 2005, the parties (which now included Fanapa USA) entered into the Contract for Purchase and Sale (which contained the terms clarified by counsel and later amended by the First Amendment to Contract for Purchase and Sale dated October 13, 2005. Copies of the Real Estate Purchase Contract, the Contract for Purchase and Sale, and the First Amendment to Contract for Purchase and Sale are attached collectively as Exhibit 4.[2]

21. During the period in which Whelan and the Debtors were discussing the acquisition of the Land through the Land Purchase Option, the Banks apparently decided to do anything to prevent the sale of the Land under the Land Purchase Option. As stated above, the price to be realized by the Banks under the Land Purchase Option was $478,500.00, which over about 30 acres of land brought the price per acre to $16,000 per acre. This price was the price that the Banks negotiated and agreed to accept for the Land in 2002. Apparently, the Banks had decided that the Land had significantly more value than the previously agreed price under the Land Purchase Option. And without any consideration of and/or determination of the reasonably equivalent value of the Land Purchase Option, the Banks decided that anything and everything should be done to prevent the exercise of the Land Purchase Option, including but not limited to

---

[2] Whelan understands that these contracts were inadvertently left off the Debtors' schedules and that the schedules will be amended to include the contracts.

interfering with the business operations of Banks Auto Parts and causing confusion concerning amounts that had been paid pursuant to the 2002 Lease.

22. As part of the Banks' campaign to avoid the exercise of the Land Purchase Option, the Banks have attempted to injure the salvage business publicly and to strong-arm the Debtors into paying for expenses for which the Banks could not account. For example, the Banks told the Debtors' customers, potential customers, vendors and potential vendors that the Debtors were going out of business. The Banks were driving away anyone who wanted or could have done business with the Debtors. As a result of the Banks' efforts, the Debtors' business suffered. The Debtors could not obtain credit and could not get the jobs that required credit.

23. The Banks also wrongfully took possession of a critical machine that the Debtors needed to operate their auto salvage business profitably. At the time of the execution of the Stock Purchase Agreements, Banks Auto Parts owned a certain machine that crushes automobiles into smaller sizes (the "Crusher"). The Crusher is an integral part of Banks Auto Parts' business in that it allows the company to "crush" into smaller sizes automobiles that have little, if any, value from a used parts perspective. The "crushed" automobiles can then be sold as scrap metal. Banks Auto Parts has not sold or otherwise voluntarily transferred its ownership in the Crusher. Having been in the auto salvage business, the Banks know that the Crusher is integral to the operations of Banks Auto Parts. The Banks also knew that it would be difficult for Bank Auto Parts to operate profitably without the Crusher. The Banks continue to deprive the Debtors of the use of the Crusher even after the Debtors filed bankruptcy.

24. The Banks have also made unjustifiable demands upon the Debtors to make certain payments to Banks Investments as "late charges and/or additional triple-net rent" (e.g. taxes and/or insurance) without providing a proper accounting to the Debtors. In stark contrast,

the Debtors continue to act in good faith by paying the Banks the sums demanded without insisting upon and/or receiving tax or insurance bills to verify the accuracy of the amounts demanded.

25. The Banks also manipulated the judicial process to oust Torrico and Fanapa LLC from the Land after Torrico and Fanapa LLC attempted to exercise the Land Purchase Option. In a letter dated April 30, 2005, Torrico and Fanapa LLC attempted to exercise the Land Purchase Option. The Banks responded by filing an unlawful detainer action on June 8, 2005 against Fanapa LLC (the "Unlawful Detainer"). The Banks claimed that Fanapa LLC was in arrears for rent in the sum of $27,825, interest, $4,372.50 late fees, and $47,133.54 damages for "unpaid taxes and insurance," costs, and reasonable attorney's fees. Included in this claim was a demand for alleged defaults and/or non-payments on the Promissory Note. A copy of the summons issued out of the Unlawful Detainer containing the claim (the "June Summons") is attached as <u>Exhibit 5</u>. The amounts set forth in the June Summons were incorrect, did not give proper credit for payments actually made, and were manipulated by the Banks to make it appear that the Debtors were in default under both the 2002 Lease and the Promissory Note. The Unlawful Detainer was set for trial on August 17, 2005. The Banks believed that they would be able to eliminate the Land Purchase Option by pursuing the Unlawful Detainer and making it extremely difficult for the Debtors to cure by misrepresenting the damages due.

26. However, the Debtors did in fact cure the alleged defaults set forth in the Unlawful Detainer. During the time period in which the Unlawful Detainer was pending, Whelan had entered into agreements with the Debtors (see above). These agreements were predicated upon the exercise of the Land Purchase Option. All of these agreements were jeopardized by the Unlawful Detainer. Rather than fight the Unlawful Detainer, the Debtors

8

4824-0467-2514.4

borrowed money from Whelan to pay the demanded amounts. An agreement was reached in which the Banks agreed to accept the sums demanded shortly after August 17, 2005. In exchange, the Banks agreed that (a) either the Unlawful Detainer would be continued, or if judgment was demanded, Banks Investments would consider Fanapa LLC's tenancy continued pursuant to the 2002 Lease; (b) Fanapa and Fanapa USA would be deemed to be current on both the 2002 Lease and the Promissory Note; and (c) Fanapa LLC would continue to have the Land Purchase Option as provided in the 2002 Lease. At this point, the Banks knew that Whelan was the source of the funding of the settlement. More problematic for the Banks was the realization that the Land Purchase Option was viable because Whelan had the financial ability to fund the exercise of the option. The Banks knew that Whelan (along with the Debtors) rely upon their representations and that Whelan would never have agreed to loan so much money[3] to cure the alleged defaults.

27. On August 17, 2005, and contrary to the Banks' agreement noted above, the Banks obtained a judgment in the Unlawful Detainer. The judgment is noted in the June Summons (see Exhibit 4). But the entry of this judgment did not stop the Debtors from curing the alleged defaults. On August 20, 2005, the Debtors carried out their part of the settlement by paying the Banks $81,333.54 by a cashier's check (the "$81,333.54 Check"). The Debtors tendered this payment with a letter dated August 19, 2005, that provided that the check represented "full and final payment of the debt owed to you by Fanapa, USA, Inc., and Fanapa LLC." The letter also stated that said payment "...brings us current, and we are authorized to continue our Lease at 8901 Jefferson Davis Highway, Spotsylvania, Virginia, as provided in the

---

[3] At this time, Whelan only knew of the amount sought in the June Summons, which was a substantial sum. Prior to trial, Whelan made repeated attempts to get the total amount from the Banks and their counsel so that he can fund a loan to the Debtors for that amount. The Banks did not give the total amount until *after* they obtained judgment (*see supra*).

Lease dated February 20, 2002." The letter further provided that: "It is also our position that the Lease remains in full force and effect, including our ability to exercise the option to purchase the premises under Section 25 of the Lease." Copies of the $81,333.54 Check and the letter dated August 19, 2005, are attached collectively as <u>Exhibit 6</u>. The Banks cashed the $81,333.54 Check; the money was never refunded or returned.

28. The Banks also continued to abuse the judicial process despite the Debtors' cure of the alleged defaults. On September 28, 2005 and despite accepting less than a month early the $81,333.54 Check that cured all alleged defaults under the 2002 Lease, the Banks obtained improperly a writ of possession for the leased premises. Now the Banks demanded another $75,075.00. The Banks threatened to enforce the writ of possession unless the Debtors paid this new amount and only of the Debtors executed a new lease. The Banks told the Debtors and Whelan that this amount related to the Promissory Note. This position is inconsistent because the Banks had told the Debtors and Whelan that the claim under the Unlawful Detainer included damages under the Promissory Note. The Banks then caused a Sheriff's Deputy of Spotsylvania County to appear at the offices of Banks Auto Parts and Fanapa LLC on the leased premises with a threat to evict the Debtors from the leasehold premises. Again, the Banks believed that they would be able to eliminate the Land Purchase Option by pursuing the writ of possession and making it extremely difficult for the Debtors and Whelan to cure by misrepresenting the damages due.

29. Faced with the prospect of the Sheriff's Deputy about to evict and in order to preserve the Land Purchase Option, on October 14, 2005, the Debtors met with the Banks and delivered the Banks a cashier's check for $80,000.00 (the "$80,000 Check"), together with a cover letter dated October 14, 2005. Copies of the $80,000 Check and cover letter are attached

10

collectively as <u>Exhibit 7</u>. The cover letter provided that $75,075.00 of the $80,000.00 Check was to be applied to what the Banks claimed was due under the 2002 Lease, and the balance ($4,925.00) was to be applied as a deposit on the purchase pursuant to the Land Purchase Option.[4] The letter provided: "This deposit exercises my option to purchase the real estate as in Section 25 of the Lease." The Banks cashed the $80,000.00 Check; the money was never refunded or returned. Just as he did before, Whelan loaned the $80,000.00 to the Debtors. The Banks knew that Whelan (along with the Debtors) rely upon their representations and that Whelan agreed to loan the Debtors yet another large sum of money to cure the alleged defaults in reliance of the Banks' representations.

30. Olander Banks also stated to Torrico at their October 14, 2005 meeting, that if he signed a new lease, he would (a) be permitted to remain in the premises and (b) have the option to purchase the property as agreed upon previously under the 2002 Lease. Thereafter, Torrico was presented with a new lease dated September 1, 2005 (hereinafter referred to as the "2005 Lease"). A copy of the 2005 Lease is attached hereto as <u>Exhibit 8</u>. When presented with the 2005 Lease, Torrico was told by representatives and agents of the Banks that he had to sign the 2005 Lease if he wanted to continue the tenancy of the leasehold premises and to be able to exercise the Land Purchase Option. Without being given an opportunity to read the 2005 Lease to confirm that the 2005 Lease contained a provision similar to the Land Purchase Option, and without being given an opportunity to consult with counsel, Torrico was induced to sign the 2005 Lease upon the aforementioned representations, and upon the further threats that if he did not sign the 2005 Lease at that time, that the Debtors would be thrown out of the premises immediately by the waiting Sheriff's deputy. Accordingly, Torrico signed the 2005 Lease on

---

[4] Torrico also gave a check in the amount of $15,000 to the Banks. The Banks cashed this check and have not refunded this money.

behalf of Fanapa LLC.[5]

## COUNT ONE
## FRAUD

31. Whelan realleges all of the allegations above.

32. At the time the Banks cashed the $81,333.54 Check and the $80,000 Check and before these payments were tendered, the Banks intentionally misrepresented to the Debtors and Whelan that the Banks would accept these payments as full and complete satisfaction of their claims.

33. The Banks knew of Whelan's involvement and that Whelan was financing the payments.

34. The Banks also knew that Whelan relied upon the Banks' representations in making the loans to the Debtors for the sole purpose of satisfying the Banks' demands.

35. Whelan justifiably relied on the Banks' misrepresentations.

36. Whelan would not have funded the $81,333.54 Check and the $80,000 Check but for the fraudulent representations by the Banks.

37. Whelan has sustained damages as a result of the Banks' fraud for at least the amounts of the $81,333.54 Check and the $80,000 Check in addition to the damages to be obtained at trial.

---

[5] The Banks have not hesitated to continue to abuse the judicial system to prevent the sale of the Land at the price they negotiated. Despite the aforementioned payments, the Banks continue to deny Fanapa LLC the right to purchase the property and instead, on or about April 10, 2006, instituted a second unlawful detainer (the "Second Unlawful Detainer") against Fanapa LLC by obtaining a Summons for Unlawful Detainer in the Spotsylvania County General District Court, which matter was removed to Spotsylvania County Circuit Court. The Banks demanded in rent and "damages" plus attorney's fees, costs, and interest; however, the Banks have failed to properly account for all appropriate charges and credits, especially the three cashier's checks they cashed in August and October 2005.

4824-0467-2514.4

## COUNT TWO
## SPECIFIC PERFORMANCE/BREACH OF CONTRACT

38. Whelan realleges all of the allegations above.

39. At the time the Banks cashed the $81,333.54 Check and the $80,000 Check, the Banks agreed with the Debtors that these payments cured all of the alleged defaults asserted by the Banks and that Whelan was a beneficiary under these agreements (the "Settlement Agreements"). The Banks knew that Whelan provided the funds for the $81,333.54 Check and the $80,000 Check. The Banks also knew that Whelan sought to cure the alleged defaults so that the Land Purchase Option would be preserved. In other words, Whelan was a third-party beneficiary under the Settlement Agreements.

40. As a third-party beneficiary to the Settlement Agreements, Whelan is entitled to enforce the terms of the agreements. The Banks also breached the Settlement Agreements by refusing to participate in the sale of the Land pursuant to the Land Purchase Option.

41. Whelan requests the Court to require the Banks to perform under the Settlement Agreements by compelling the Banks to perform under the 2002 Lease and to comply with the exercise of the Land Purchase Option.

42. Alternatively, Whelan requests the Court to award him damages of no less than $161,333.54 and other damages to be proven at trial.

## COUNT THREE
## CIVIL CONSPIRACY

43. Whelan realleges all of the allegations above.

44. The Banks combined, by concerted action, to accomplish fraudulent or unlawful purposes, or to accomplish purposes, not in themselves fraudulent or unlawful, by fraudulent or unlawful means.

4824-0467-2514.4

45. The conspiratorial acts by the Banks injured Whelan.

46. As a direct result of the conspiracy, Whelan has suffered damages to be proven at trial.

### COUNT FOUR
### TORTIOUS INTERFERENCE WITH CONTRACT

47. Whelan realleges all of the allegations above.

48. Whelan had a valid contractual relationship with the Debtors.

49. The Banks knew of the existence of the contracts between Whelan and the Debtors.

50. The Banks' unjustified and wrongful conduct disrupted the contractual relationship between Whelan and the Debtors.

51. As a direct and proximate cause of the unjustified and wrongful conduct of the Banks, Whelan has suffered damages in an amount to be proven at trial.

                                      **EDWARD F. WHELAN, III**

                                      By:  /s/ Loc Pfeiffer

**KUTAK ROCK LLP**
Loc Pfeiffer  (VSB No. 39632)
Kimberly A. Pierro  (VSB No. 71362)
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
(804) 644-1700
  *Counsel for Edward F. Whelan, III*

4824-0467-2514.4